Joseph A. Piesco, Jr. (jpiesco@kasowitz.com)
Daniel Turinsky (dturinsky@kasowitz.com)
Rachel F. Ehrenpreis (rehrenpreis@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for Plaintiff
American Management Association International

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

AMERICAN MANAGEMENT ASSOCIATION          :
INTERNATIONAL,                                           :        Civil Action No. 08 Civ. 6998
                                                                    :        (SHS) (FM)
                                         Plaintiff,     :
                                                                    :
                      vs.                                           :
                                                                    :
STUART SYME,                                            :
GERSHENSON AND ASSOCIATES, INC., and     :
STEPHEN GERSHENSON, individually                        :
and in his capacity as President of                     :
GERSHENSON AND ASSOCIATES, INC.,                        :
                                                                    :
                                                                    :
                                         Defendants.    :

-------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S APPLICATION FOR
### PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF RELEVANT FACTS ...................................................... 4

    A.    Background ....................................................................... 4

    B.    The Non-Solicitation and Confidentiality Agreements ........................... 4

    C.    Defendants Conspire to Breach Their Agreements With AMA And Steal
        One of AMA's Largest Customers ........................................ 6

LEGAL ARGUMENT ...................................................................... 10

I.    AMA IS LIKELY TO SUCCEED ON THE MERITS .................................. 11

    A.    AMA Is Likely To Succeed On Its Breach of Contract Claim ................ 11

        1.    The Temporal and Geographic Restrictions Are Reasonable ................. 12

        2.    The Restrictive Covenant is Necessary to Protect AMA's
            Legitimate Interests ................................................ 12

        3.    The Restrictive Covenant Does Not Impose An Undue Hardship
            on Defendants ...................................................... 14

        4.    The Independent Contractor Agreement Is Not Injurious To
            The Public ........................................................ 14

    B.    There is a Substantial Likelihood that AMA Will Succeed in
        Establishing That Defendants Have Tortiously Interfered with Its
        Contractual Relationships ............................................ 15

    C.    AMA is Likely to Succeed In Showing that Defendants Have
        Engaged in Unfair Competition and Have Been Unjustly Enriched .............. 16

II.    AMA WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT
     GRANT THE RELIEF SOUGHT ...................................................... 18

III.    ALTERNATIVELY, AMA SHOULD BE GRANTED AN INJUNCTION AS
      IT HAS RAISED SERIOUS QUESTIONS GOING TO THE MERITS AND
      THE BALANCE OF HARDSHIPS WEIGHS IN ITS FAVOR ........................... 19

**Page**

IV.    AMA IS ENTITLED TO EXPEDITED DISCOVERY ....................................................20

CONCLUSION ...........................................................................................................23

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Albert v. Loksen,
    239 F.3d 256 (2d Cir. 2001) ...................................................................15

Alside Div. of Assoc. Materials, Inc. v. Leclair,
    743 N.Y.S.2d 898 (3d Dep't 2002) ......................................................17,18

American Para Professional Sys. v. Examination Mgmt Servs.,
    625 N.Y.S.2d 33 (1st Dep't 1995) ........................................................11

Ayyash v. Bank Al-Madina,
    04 Civ. 9201, *2005 U.S. Dist. LEXIS 14276 (S.D.N.Y. July 12, 2005)* .....................................21

B.U.S.A. Corp. v. Ecogloves, Inc.,
    No. 05 Civ. 9988 (SCR), 2006 U.S. Dist. LEXIS 85988
    (S.D.N.Y. Jan. 31, 2006) ..................................................................15, 19

BDO Seidman v. Hirshberg,
    93 N.Y.2d 382, 690 N.Y.S.2d 854 (1999)............................................11, 13

Chernoff Diamond & Co. v. Fitzmaurice, Inc.,
    651 N.Y.S.2d 504 (1st Dep't 1996) ....................................................12,18

Comprehensive Cmty. Develop. Corp. v. Lehach,
    636 N.Y.S.2d 755 (1st Dep't 1996) ....................................................17

Coverage Corp. v. Raifman,
    685 N.Y.S.2d 283 (2d Dep't 1999) ....................................................12

Crown IT Servs. v. Koval-Olsen,
    782 N.Y.S.2d 708 (1st Dep't 2004) ....................................................12

Don King Prods., Inc. v. Hopkins,
    04 Civ. 9705, 2004 U.S. Dist LEXIS 25917
    (S.D.N.Y. Dec. 23, 2004) ..................................................................21

DoubleClick, Inc. v. Henderson,
    No. 116914/97, 1997 N.Y. Misc. LEXIS 577
    (N.Y. Sup. Ct. Nov. 5, 1997)..............................................................16

Ecolab, Inc. v. K.P. Laundry Machinery, Inc.,
    656 F. Supp. 894 (S.D.N.Y. 1987) ....................................................15

Electrolux Corp. v. Val-Worth, Inc.,
   161 N.E.2d 197 (N.Y. 1959) .................................................................16

Interactive Edge, Inc. v. Martise,
   No. 97 Civ. 3354 (RO), 1998 U.S. Dist. LEXIS 801
   (S.D.N.Y. Jan. 30, 1998) ...................................................................14

Jiffy Lube Int'l, Inc. v. Weiss Bros. Inc.,
   834 F. Supp. 683 (D.N.J. 1993) ...........................................................14

Johnson Controls, Inc. v. A.P.T. Critical Sys.,
   323 F. Supp. 2d 525 (S.D.N.Y. 2004) ...................................................12

Lumex Inc. v. Highsmith,
   919 F. Supp. 624 (E.D.N.Y. 1996) .......................................................13

N. Atl. Instruments, Inc. v. Haber,
   188 F.3d 38 (2d Cir. 1999) .................................................................10

Norbrook Laboratories Ltd. v. G.C. Hanford Manufacturing Co.,
   126 Fed. Appx. 507 (2d Cir. 2005).............................................10,16,19

OMG Fid., Inc. v. Sirius Techs., Inc.,
   6:06-CV-1184, 2006 U.S. Dist. LEXIS 83388
   (N.D.N.Y. Nov. 16, 2006) ..................................................................21

Stiepleman Coverage Corp. v. Raifman,
   685 N.Y.S.2d 283 (2d Dep't 1999)........................................................12

Tarrytown House Condo., Inc. v. Hainje,
   161 A.D.2d 310, 555 N.Y.S.2d 83 (1st Dep't 1990)................................17

Uniform Rental Div., Inc. v. Moreno,
   441 N.Y.S.2d 538 (2d Dep't 1981)........................................................12

Unisource Worldwide. Inc. v. Valenti,
   196 F. Supp. 2d 269 (E.D.N.Y. 2002) ..................................................11

**Statutes**

28 U.S.C. § 1657(a) .............................................................................21

**Rules**

Fed. R. Civ. P. 26(d).............................................................................21

## PRELIMINARY STATEMENT

Plaintiff American Management Association International ("AMA"), an 85-year old non-profit corporation which provides management education and training products and services to the management community throughout the world, seeks to enforce its contractual and common law rights against Defendants Stuart Syme ("Syme"), Stephen Gershenson ("Gershenson") and Gershenson and Associates, Inc. ("G&A"), former independent contractors of AMA who secretly conspired to, and in fact did, usurp corporate opportunities properly, and legally, belonging to AMA in breach of their respective common law and express contractual obligations to AMA, and who have unlawfully exploited, and are continuing to unlawfully exploit, AMA's client relationships and confidential and proprietary business information (hereafter, "Confidential Information") for their own personal benefit, to the irreparable detriment of AMA.

AMA is routinely engaged in providing management education and training to the corporate community and, among other activities, offers over 170 different seminars in a wide variety of subject areas.  In order to provide these and other services, AMA utilizes a diverse group of independent contractors, whom AMA refers to as "faculty," "presenters," or "speakers," who are well-versed experts in the particular substantive areas they teach, to conduct the training seminars on AMA's behalf, and, in some cases, to develop and update AMA's course materials.

Prior to May 23, 2008, Syme was an AMA presenter whose main responsibility was to deliver seminars and provide training to AMA's corporate clients on various project management topics.  Syme is affiliated with, and was paid by, G&A and Gershenson.  Gershenson, prior to May 23, 2008, also was a presenter for AMA.

1

As a condition precedent to becoming a presenter for AMA, both Syme and Gershenson executed AMA's Independent Contractor Agreement.[1] Pursuant to that Agreement, Syme and Gershenson agreed they would not solicit or accept engagements from any AMA clients to whom they provided, or were scheduled to provide, services on behalf of AMA during the term of their agreements, and for a period of one (1) year following the completion or acceptance of an engagement to such client(s), respectively. Further, both Syme and Gershenson were required to bring all speaking opportunities to AMA's attention. These restrictions, which were essential conditions of their contractual relationships with AMA, specifically were designed to prevent speakers like Syme and Gershenson from soliciting clients they were introduced to by AMA and, critically, to prohibit them from usurping AMA's corporate opportunities.

On or about April 16, 2008, Defendants brazenly breached their contractual and common law duties to AMA by surreptitiously delivering a three day training seminar behind AMA's back to one of AMA's largest clients, The Shaw Group, Inc. ("Shaw"), after AMA was falsely advised that this previously scheduled seminar had been "postponed" as part of Defendants' wrongful scheme to steal this important customer relationship from AMA. Needless to say, Defendants' conduct is expressly prohibited by, and in violation of, the Independent Contractor Agreements.

AMA previously had scheduled (and Shaw had agreed to) numerous seminars for Shaw that, absent Defendants' wrongful conduct, were to take place throughout the remainder of the 2008 calendar year. As a result of Defendants' intentional and wrongful interference with AMA's relationship with Shaw, those opportunities have been cancelled and now AMA's entire relationship with Shaw is in immediate peril of suffering the same fate. Unless Defendants are immediately enjoined from engaging in further wrongful conduct (and they have failed to

---

[1] True and correct copies of the Syme and Gershenson Agreements are attached to the Verified Complaint as Exhibits A and B, respectively.

provide any acceptable assurances that they will stop interfering with AMA's client relationships), AMA's customer relationship with Shaw will surely be forever lost.

As demonstrated by the facts and arguments presented herein, AMA is likely to succeed on the merits of its claims. Indeed, Defendants cannot possibly dispute the fact that (1) they delivered the April 16th seminar to Shaw without AMA's knowledge; (2) G&A was paid directly by Shaw for the presentation; (3) Syme and Gershenson breached their contractual obligation not to present to AMA clients during the term of their Agreements; (4) Syme and Gershenson purposely breached their respective obligations to bring the Shaw opportunity to AMA's attention; and (5) Defendants are continuing to solicit Shaw.

Moreover, the balance of hardships weighs definitively in AMA's favor, especially since without the requested injunction AMA will continue to suffer the irreparable loss of one of its most valued client relationships, competitive edge, reputation and goodwill. Further, the injunctive relief sought by AMA will not cause any hardship to Defendants, inasmuch as the relief requested only seeks to protect against the further violations of Defendants' contractual and common law obligations to AMA, and certainly will not (nor is it intended in any way to) prevent Defendants from *fairly* competing in the marketplace.

Accordingly, AMA seeks an Order, among other things: (a) directing Defendants to comply with the contractual restrictive covenants in their agreements with AMA; (b) barring Defendants from soliciting or servicing AMA's clients to whom they provided services on behalf of AMA for a period through and including July 25, 2009; (c) directing Defendants to return, and not to use or disclose for any purpose, AMA's confidential, proprietary or trade secret information; and (d) directing Defendants to account for, disgorge and repay to AMA any and all revenue or other monies they received as a result of their wrongful conduct.

## STATEMENT OF RELEVANT FACTS

The facts set forth in the Verified Complaint and accompanying Affidavit of Patricia Leonard ("Leonard Aff.") are fully incorporated herein by reference and are summarized below. References to exhibits herein are to the exhibits attached to the Verified Complaint, unless otherwise designated.

### A.    Background

AMA is a non-profit corporation headquartered in New York City, with locations throughout the world, that is dedicated to management education and training and has been incorporated as an education corporation by the Regents of the University of the State of New York.  AMA provides management education and training to the corporate community and offers over 170 different seminars in a wide variety of subject areas.  In order to provide these and other services, AMA utilizes a diverse group of independent contractors, whom AMA refers to as "faculty," "presenters" or "speakers" and who are experts in particular substantive areas, to conduct the training seminars on AMA's behalf.

G&A is a corporation that provides management training services including providing speakers for various AMA clients.  Gershenson is the President of G&A and, prior to May 23, 2008, was as a presenter for AMA.  Prior to May 23, 2008, Syme was a presenter for AMA and, upon information and belief, is a subcontractor of, and/or directly affiliated with, G&A.  When Syme performed services for an AMA client, AMA received direct payment from the client, and then paid G&A for Syme's services; G&A then paid Syme.

### B.    The Non-Solicitation and Confidentiality Agreements

Syme entered into an Independent Contractor Agreement with AMA, effective April 15, 2007, which set forth the terms pursuant to which Syme would provide services as a presenter

for AMA (the "Syme Agreement"). Among other things, the Syme Agreement prohibited Syme

from (i) soliciting or hiring AMA's employees; (ii) using or disclosing AMA's confidential and

proprietary business information, including, but not limited to, course materials, customer lists,

attendee lists, business plans and strategies; and (iii) soliciting or accepting engagements from

clients that Syme provided services to, or was scheduled to provide services to, on behalf of

AMA.

Specifically, the Syme Agreement states, in pertinent part:

> **Other Clients**. Except as expressly provided herein, nothing in
> this Agreement shall restrict you from offering speaking, teaching,
> consulting or other Services to any other organization, corporation,
> institution or person. ***Your acceptance of an engagement from
> AMA, however, indicates your understanding and agreement not
> to solicit or accept engagements from AMA's clients or attendees
> to whom you have provided or will provide Services on behalf of
> AMA for the period during the term of this Agreement and for
> one (1) year following the completion of an engagement to such
> client(s) or attendees.*** The foregoing restrictions include, but are
> not limited to, soliciting attendees for, or accepting from such
> attendees, assignments for on-site engagements, distribution of
> non-AMA course materials and/or the presentation of logos,
> copyrights and trademarks other than those of AMA and related
> affiliates.

Ibid., Ex. A, ¶ 4. (emphasis added). In addition, Syme was required to refer to AMA "[a]ny

inquiries to the Contractor relating to such Services from or on behalf of AMA clients and/or

attendees during the applicable time period set out herein." Ibid.

Gershenson executed an Independent Contractor Agreement with AMA, effective July 1,

2006 (the "Gershenson Agreement"). See Compl. Ex. B. The Gershenson Agreement is similar

to the Syme Agreement in almost every respect with the exception that Gershenson's agreement

prohibits him from soliciting, providing services to or accepting engagements from any AMA

clients to whom he provided, or was scheduled to provide, services during the term of his

Agreement and for the one year period following the *acceptance* of an engagement from AMA to serve such clients. Ibid., Ex. B, ¶ 4. In addition, Gershenson, like Syme, was required to refer all speaking opportunities relating to his Agreement to AMA.

Pursuant to their respective Independent Contractor Agreements, both Syme and Gershenson also were required to refrain from using or disclosing any of AMA's Confidential and Proprietary information. See Compl. ¶¶ 25, 26 and Exs. A and B, ¶ 5.

AMA takes reasonable steps to protect its Confidential Information, including, but not limited to, requiring its presenters to sign the Independent Contractor Agreements which contain the confidentiality provisions, and maintaining policies to protect against the disclosure of its Confidential Information.

**C.      Defendants Conspire to Breach Their Agreements With AMA And Steal One of AMA's Largest Customers**

One of AMA's largest customers is Shaw, a corporate conglomerate that provides engineering, design, construction, and maintenance services to government and private-sector clients in a wide array of industries, including the energy, environmental, infrastructure, and emergency response markets. AMA has been providing management educational services to Shaw since February 2006 and the amount of seminars presented has increased significantly year after year. During this time (and prior to Defendants' unlawful interference with their relationship), AMA and Shaw have enjoyed an extremely healthy business relationship, whereby AMA provides an array of training services and related seminar materials to Shaw.

Since the inception of AMA's relationship with Shaw, Gershenson and Syme have acted as presenters for AMA (with AMA paying G&A for their services) and, up until the termination of their Independent Contractor Agreements, have conducted training seminars and provided services to Shaw on AMA's behalf on numerous occasions. AMA believes that neither Syme nor

Gershenson (nor G&A) had any business relations with Shaw prior to presenting seminars on AMA's behalf.

On or about October 15, 2007, Shaw entered into a master Training Agreement with AMA (the "Training Agreement"), whereby AMA agreed to provide training to all of Shaw's business units at a discounted rate based on the volume of services purchased by Shaw.

Paragraph 12 of the Training Agreement states as follows:

> Hiring or Retention of Personnel. During the term of this Agreement and for one year following the termination hereof, neither party shall recruit either as an employee or on an independent contractual basis any person who is an employee of the other party or retained on an independent contractual basis by that party for purposes of this Agreement, without the prior written consent of that party.

One of Shaw's largest business units is Shaw Environmental & Infrastructure ("Shaw E&I"). AMA has conducted management training on numerous occasions for Shaw E&I during the course of its relationship with Shaw, and had scheduled a management training seminar with AMA for April 16-18, 2008. Additional seminars were scheduled to be conducted for other Shaw business units for the May through July 2008 time period as well. All of these seminars were scheduled in accordance with, and pursuant to, the Training Agreement and were to be delivered by Syme.

On or about April 9, 2008, AMA was informed that the April 16, 2008 seminar was being "postponed" until June. On April 16, 2008, an AMA representative visited the site where the training for Shaw E&I was to have occurred and discovered that the training was proceeding as originally scheduled, *with Syme as the presenter*, without AMA's knowledge and participation and in breach of the prohibitions set forth in Syme's Independent Contractor Agreement. On April 18, 2008, the AMA representative confronted Syme, who confirmed he was conducting the Shaw E&I training program independent of AMA. Given their longstanding relationship and the

fact that G&A most likely was paid directly by Shaw for this seminar, there can be little doubt that Gershenson knew Syme was presenting this seminar to Shaw.

Based on the circumstances, it is clear that Syme, Gershenson and G&A intentionally colluded to interfere with AMA's client relationship with Shaw -- *a relationship they knew was worth countless millions of dollars* -- and to unfairly usurp this and all future corporate opportunities that, but for their wrongful conduct, would have been AMA's. Defendants' conduct in presenting the management training seminar to Shaw E&I was in blatant violation of the restrictive covenant provisions contained in the Syme and Gershenson Agreements.

By letter dated May 23, 2008, AMA terminated the Syme and Gershenson Agreements on account of Syme's and Gershenson's flagrant breach of the contractual restrictions contained therein, including without limitation their obligations not to solicit or service AMA's clients and to bring all opportunities to present to AMA clients to the attention of AMA.

AMA has reason to believe that Syme and Gershenson, with the aid of Gershenson's company, G&A, are seeking to upend AMA's lucrative customer relationship with Shaw and intend to continue (if they are not doing so already) to solicit management training opportunities from Shaw, in breach of Syme and Gershenson's express contractual agreements with AMA. AMA further believes that Defendants have attempted, and are continuing to attempt, to solicit and provide management training to other AMA clients in breach of their express contractual agreements with AMA.

In response to Defendants' bad-faith conduct and purposeful breaches of their obligations to AMA, on May 23, 2008, AMA sent letters to both Syme and Gershenson demanding, among other things, that they immediately terminate their unlawful solicitation and servicing of Shaw. Defendants, however, refused to provide any reasonable assurances to AMA or, equally critical,

to agree to refrain from providing services to Shaw in accordance with their obligations. Quite the contrary, Defendants took the untenable position that "Shaw E&I" was not a "client" of AMA, and that they were free to take this business from AMA – despite the fact that:

(i) **both Syme and Gershenson have presented to Shaw for years on AMA's behalf;**

(ii) **the master Training Agreement between AMA and Shaw governed the speaking engagements for all Shaw business units; and**

(iii) **Syme was actually scheduled to present a seminar to Shaw E&I on April 16, 2008 and for many sessions thereafter for AMA.**

It is patently clear under the circumstances that, absent an injunction, Defendants will continue to collude in an effort to misappropriate for themselves AMA's valuable client relationships.

Since April, on account of Defendants' wrongful conduct and interference with AMA's relationship with Shaw, Shaw has cancelled numerous previously scheduled seminars with AMA. Worse yet, Shaw has given strong signals to AMA that it may no longer utilize AMA's services in the future. Defendants' unlawful conduct and material breaches of their contractual obligations has caused, and is continuing to cause, AMA to suffer substantial irreparable harm, including, without limitation, the loss of goodwill and its valuable and irreplaceable client relationships.

AMA has reason to believe that Defendants' wrongful and malicious conduct was (and is) deliberate, calculated and purposeful, and their conspiracy was intentionally designed to sabotage AMA's relationship with Shaw and to steal Shaw's business for themselves.

## LEGAL ARGUMENT

Injunctive relief is appropriate when the movant demonstrates (1) that it will suffer irreparable harm if the motion is not granted and (2) either (a) a likelihood that it will succeed on the merits of the action or (b) a sufficiently serious question going to the merits of the litigation and the balance of hardships tipping decidedly in the movant's favor. See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., 126 Fed. Appx. 507, 508, 2005 U.S. App. LEXIS 4881 (2d Cir. 2005); N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43 (2d Cir. 1999).

The standards for emergent injunctive relief clearly are satisfied here. AMA has been irreparably harmed by Defendants' flagrant violations of their contractual obligations with AMA, including Defendants' outright theft of AMA's contractual relationship with Shaw, which unlawful conduct will cause, if it has not already caused, inter alia (i) AMA to lose its lucrative business and contractual relationship with Shaw, (ii) damages and losses to the integrity of AMA's presentations and materials, and (iii) irreparable harm to its reputation, good will and future business prospects. The foregoing harm, which will continue absent the issuance of appropriate injunctive relief, constitutes irreparable injury as a matter of law because it is not compensable by money damages. See N. Atl. Instruments, 188 F.3d at 49.

Moreover, as demonstrated below, AMA is likely to succeed on the merits of each of its claims. Indeed, the facts establish, and discovery undoubtedly will show, that Defendants knowingly and maliciously usurped AMA's business and contractual relationship with AMA's customers, including, but not limited to, its lucrative relationship with Shaw, while actively performing services for AMA and subject to various contractual restrictions and common law duties. The facts also demonstrate that AMA is likely to succeed on its common law claims of,

among other things, tortious interference with contract, tortious interference with business

relations, unfair competition and unjust enrichment.

Finally, Defendants will suffer no hardship should the Court grant AMA the injunctive

relief sought herein.  AMA only seeks such immediate injunctive relief as necessary to protect its

rights pursuant to its contractual relationships with Defendants.  Defendants will continue to be

able to conduct its business and compete with AMA - they simply will be precluded from doing

so in violation of their contractual and common law obligations to AMA.  Thus, the balance of

hardships weighs decisively in AMA's favor.

## I.    AMA IS LIKELY TO SUCCEED ON THE MERITS

### A.    AMA Is Likely To Succeed On Its Breach of Contract Claim

A restrictive covenant will be enforced if: (1) it is reasonable in time and space; (2) the

restriction is necessary to protect a legitimate interest of the employer; (3) it does not impose an

undue hardship on the employee; and (4) it is not injurious to the public.  See Unisource

Worldwide. Inc. v. Valenti, 196 F. Supp. 2d 269, 276 (E.D.N.Y. 2002); BDO Seidman v.

Hirshberg, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854 (1999).  AMA easily establishes each of

these elements.  Moreover, where, as here, the restrictive covenants govern a contractual

agreement between a company and independent contractors, such restrictions are enforceable.

See, e.g., American Para Professional Sys. v. Examination Mgmt Servs., 625 N.Y.S.2d 33, 34

(1st Dep't 1995) ("the restrictive covenant at issue, which relates to a commercial contract

between independent contractors rather than an employment agreement and which restricts the

independent contractors from competing in their local area or territory for a one year period, is,

on its face, reasonably limited, both temporally and geographically, and not unduly

burdensome.").

1.    **The Temporal and Geographic Restrictions Are Reasonable**

A temporal limitation of one year is reasonable.  Indeed, courts within New York routinely have enforced restrictive covenants for longer periods, such as two years.  See, e.g., Unisource Wordwide, Inc., 196 F. Supp. 2d at 277 (enforcing two year provision); Chernoff Diamond & Co. v. Fitzmaurice, Inc., 651 N.Y.S.2d  504, 505-506 (1st Dep't 1996) (same); Stiepleman Coverage Corp. v. Raifman, 685 N.Y.S.2d 283 (2d Dep't 1999) (same).

Likewise, Defendants cannot possibly quibble with the geographic scope of the restriction inasmuch as it is based on specific customers and clients of AMA (and which AMA introduced them to) as opposed to restricting Defendants from engaging in competitive business confined to a geographic location.  See, e.g., Uniform Rental Div., Inc. v. Moreno, 441 N.Y.S.2d 538, 539 (2d Dep't 1981) (affirming the trial court's grant of injunctive relief where the restrictive covenant prevented Defendant from soliciting or serving any customers known by him to be those of the Plaintiff); Crown IT Servs. v. Koval-Olsen, 782 N.Y.S.2d 708, 710-11 (1st Dep't 2004) (holding that "[t]here is no serious dispute that this [restrictive] clause, which only prohibits defendants from servicing [Plaintiff]'s former clients for one year at the client location, was reasonable in time and area. In addition, the clause is limited to only former clients to which the contractor has been introduced directly or indirectly through [Plaintiff].).

2.    **The Restrictive Covenant is
      Necessary to Protect AMA's Legitimate Interests**

New York Courts have held that the protection of customer relationships is a legitimate protectable interest. See Johnson Controls, Inc. v. A.P.T. Critical Sys., 323 F. Supp. 2d 525, 536 (S.D.N.Y. 2004) (granting preliminary injunctive relief barring Defendant from directly or indirectly servicing Plaintiff's customers and finding "that [Plaintiff] likely has a legitimate interest in protecting its client relationships and goodwill so that the restrictive covenants in

12

[Defendants'] employment agreements are enforceable to the extent necessary to protect that interest.") (citing <u>BDO Seidman</u>, 93 N.Y.2d 382 at 390-92).

In this case, Defendants have usurped AMA's client relationships, which AMA painstakingly developed over a number of years. But for AMA's introducing Defendants to Shaw and other clients, Defendants would not have had the opportunity to engage in the competitive activity with AMA that they are engaging in currently. Even more egregious is the fact that AMA was scheduled to present to Shaw E&I on April 16, 2008, and had scheduled Syme to conduct this presentation as an agent of AMA. That presentation purportedly was "postponed," but in reality the presentation was not "postponed" and in fact was conducted purposely by Syme without AMA's knowledge, while Defendants *were still under contract with AMA*.

Thus, not only have Defendants competed with AMA after the termination of their respective contracts, they stole clients and already-scheduled business opportunities of AMA *while still working as independent contractors for AMA*. Moreover, AMA was scheduled to present to Shaw on numerous other occasions throughout the year. Because of Defendants' conduct those opportunities have been cancelled by Shaw and AMA has lost untold sums, and Defendants are attempting to usurp those business opportunities for themselves, to the extreme detriment of AMA. AMA has a legitimate protectable interest in the client relationships they have developed through the expenditure of time and resources, and have a legitimate protectable interest in business opportunities they already had, which Defendants have stolen, and continue to attempt to steal.

3.    **The Restrictive Covenant Does Not**
      **Impose An Undue Hardship on Defendants**

Enforcement of the restrictions that Defendants freely and voluntarily agreed to abide by will not impose an undue hardship upon them. Moreover, given that Defendants have already willfully breached the terms of their agreements, they should not be excused from facing the consequences of such conduct. See, e.g., Jiffy Lube Int'l, Inc. v. Weiss Bros. Inc., 834 F. Supp. 683, 693 (D.N.J. 1993) ("To the extent the defendants suffer significant ... damages from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant... [I]t is not a basis for denying a plaintiff the relief to which it is legally entitled").

4.    **The Independent Contractor Agreement Is Not Injurious To**
      **The Public**

There is no public interest that precludes the Court from ordering the injunctive relief AMA has requested. In fact, it is in society's best interest to recognize and enforce agreements that are entered into voluntarily. Allowing individuals and businesses to disregard such a promise would result in behavior which should not be condoned or encouraged. Defendants freely and voluntarily agreed to be bound by the Independent Contractor Agreements. The Court should require them to honor the promises they made. See Interactive Edge, Inc. v. Martise, No. 97 Civ. 3354, 1998 U.S. Dist. LEXIS 801, at *14 (S.D.N.Y. Jan. 30, 1998) (enforcing covenant not to compete in settlement agreement and, in rejecting defendant's argument that the covenant was unfair, noting that "the Agreement was the product of a voluntary bargain," and that defendant "has no one to blame for his present plight but himself").

**B.    There is a Substantial Likelihood that AMA Will Succeed in Establishing That Defendants Have Tortiously Interfered with Its Contractual Relationships**

Defendants have tortiously interfered with AMA's contract with Shaw, i.e., the master Training Agreement, by encouraging Shaw to breach the obligations it owed to AMA. To establish a claim for tortious interference with contract, a plaintiff must show (1) that there was a valid contract, (2) that the defendant knew of the contract, (3) that the defendant intentionally interfered with the contract and (4) damages. See Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001); B.U.S.A. Corp. v. Ecogloves, Inc., No. 05 Civ. 9988 (SCR), 2006 U.S. Dist. LEXIS 85988, at *19 (S.D.N.Y. Jan. 31, 2006); Ecolab, Inc. v. K.P. Laundry Mach., Inc., 656 F. Supp. 894, 897 (S.D.N.Y. 1987) (granting the employer's motion for a preliminary injunction against the former employee's new employer, because it tortiously induced the breach of an employment agreement containing non-solicitation and trade secret provisions).

In this case, Defendants were well aware that Shaw was bound by the Training Agreement it entered into with AMA, which provided *that AMA* would provide Shaw with management education and training services and that Shaw was contractually prohibited from circumventing the Agreement by hiring AMA's contractors directly. Despite this knowledge, and in violation of their own contracts with AMA, Defendants intentionally interfered with Shaw's contractual obligations by surreptitiously soliciting and encouraging Shaw to cancel the presentations scheduled to be delivered to it by AMA and to instead replace AMA with Syme, without AMA's knowledge or consent. Defendants had no right, and certainly no legitimate business reason, for interfering with AMA's contractual relationships with Shaw. AMA has suffered substantial damage as a result of Defendants' conduct, in that it has lost the highly

lucrative business and contractual customer relationship, to its former independent contractors. As such, AMA is likely to prevail on its tortious interference claim.

**C.    AMA is Likely to Succeed In Showing that Defendants Have Engaged in Unfair Competition and Have Been Unjustly Enriched**

By virtue of Defendants' unlawful conduct, Defendants clearly have been, and currently are, unfairly competing against AMA.  Under New York law, "'the essence of an unfair competition claim . . . is that the defendant has misappropriated the labors and expenditures of another.'"  Norbrook Labs., 126 Fed. Appx. at 509.  Unfair competition exists when "a former employee misappropriates and exploits confidential information belonging to her former employer in abuse of her relationship of trust."  DoubleClick, Inc. v. Henderson, No. 116914/97, 1997 N.Y. Misc. LEXIS 577, at *19 (N.Y. Sup. Ct. Nov. 5, 1997) (granting preliminary injunction on unfair competition claim when defendants used former employer's strategic documents to form a competing company).  Such conduct encompasses the "bad faith" long required for finding unfair competition as well as the long recognized principle that "one may not misappropriate the results of the skill, expenditures and labors of a competitor."  Electrolux Corp. v. Val-Worth, Inc., 161 N.E.2d 197, 204 (N.Y. 1959); Norbrook Labs., 126 Fed. Appx. at 509.

As set forth above, Defendants engaged in a deceitful scheme to misappropriate AMA's client relationships by encouraging Shaw to "postpone" and then cancel seminars previously scheduled through AMA, which seminars Defendants were aware of only through their contractual relationships with AMA, and instead schedule the seminars directly through Defendants.  But for Defendants' deceitful behavior whereby they surreptitiously commandeered these business opportunities for themselves, AMA would have reaped, and would have continued to reap, substantial financial benefits.

Moreover, it appears clear that Defendants are using AMA's Confidential Information, including pricing information and seminar materials in order to achieve their wrongful goals and complete their now-exposed coup. Defendants are poised to continue to unfairly compete with AMA, and, unless enjoined, AMA will be irreparably harmed by their ongoing unlawful conduct. Given the evidence, AMA is likely to succeed on its claims for unfair competition. See Comprehensive Cmty. Develop. Corp. v. Lehach, 636 N.Y.S.2d 755, 756-57 (1st Dep't 1996) (sustaining unfair competition claim where defendant had misappropriated previous employer's patient records and then used them to solicit those patients); Alside Div. of Assoc. Materials, Inc. v. Leclair, 743 N.Y.S.2d 898, 898 (3d Dep't 2002) (granting preliminary injunction to prevent departing employee from unfairly competing when he had knowledge of confidential and proprietary pricing information).

AMA also is likely to succeed on its claim for unjust enrichment. To establish a claim for unjust enrichment, a plaintiff must show that "a benefit was bestowed upon [defendants] by plaintiffs and that defendants will obtain such benefit without adequately compensating plaintiffs therefor." Tarrytown House Condo., Inc. v. Hainje, 161 A.D.2d 310, 313, 555 N.Y.S.2d 83, 86 (1st Dep't 1990). Here, AMA diligently expended valuable resources and extreme effort to foster and maintain its lucrative business relationship with Shaw, in addition to expending great effort and resources in creating and maintaining its Confidential Information, including customer lists, pricing information, and seminar materials. Defendants have benefited directly from AMA's Confidential Information and client relationships by using those items to unjustly misappropriate AMA's relationship with Shaw. Defendants, of course, did not pay AMA for this business.

## II.    AMA WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THE RELIEF SOUGHT

AMA currently suffers, and will continue to suffer, irreparable harm unless an injunction is immediately granted. Defendants' breaches of their contractual and common law obligations continue to threaten to injure and diminish AMA's reputation, client confidence and trust, and goodwill, as well as its significant competitive edge in the marketplace.

As stated above, Defendants already have stolen business from AMA while leading AMA to believe that they were still acting as loyal independent contractors for AMA and in AMA's best interest, in violation of their contractual obligations to AMA. In so doing, Defendants clearly utilized AMA's Confidential Information, including, but not limited to, confidential customer information, pricing information, training materials and business strategies to which Defendants gained access solely through their relationships with AMA. As the court explained in <u>Alside</u>, when a plaintiff has made significant efforts to nurture repeat business, if competitors were permitted to undermine those relationships "by using plaintiff's confidential and proprietary business information to underbid it, plaintiff will not only lose business, but will also suffer a dilution of the good will it has developed with its customers." <u>Alside</u>, 743 N.Y.S.2d at 899. In the absence of the requested restraint against Defendants, AMA would thus suffer irreparable harm. <u>See Chernoff Diamond & Co.</u>, 651 N.Y.S.2d at 506 ("plaintiff would suffer irreparable harm should its clients terminate their relationships with it in order to use defendant's services").

For the reasons stated above, Defendants' servicing of AMA clients in direct violation of their Independent Contractor Agreements will cause (if it has not already caused) irreparable harm to AMA. Moreover, their use and disclosure of AMA's Confidential Information will also cause irreparable harm to AMA. Thus, Defendants should be enjoined from utilizing or

disclosing AMA's Confidential Information and from soliciting or servicing AMA's customers with whom they either provided services to, or were scheduled to provide services to, on behalf of AMA.

## III.    ALTERNATIVELY, AMA SHOULD BE GRANTED AN INJUNCTION AS IT HAS RAISED SERIOUS QUESTIONS GOING TO THE MERITS AND THE BALANCE OF HARDSHIPS WEIGHS IN ITS FAVOR

Although AMA has established a likelihood of success on the merits, AMA also is entitled to emergent injunctive relief by demonstrating (i) serious questions going to the merits and (ii) that the balance of hardships weigh in its favor.  See Norbrook Labs., 126 Fed. Appx. at 508.

As a preliminary matter, AMA has demonstrated serious questions going to the merits of its claims.  As described in detail above, Defendants have stepped well over the lines of fair competition by soliciting AMA's clients and encouraging those clients to breach their own contractual obligations to AMA.

Moreover, the balance of the hardships weigh heavily in AMA's favor as without a preliminary injunction it risks forever losing the highly lucrative client relationships it has obtained through the expensive and time consuming process of fostering those client relationships.  In contrast, if a preliminary injunction is granted, Defendants will remain free to compete in the industry; they simply will be narrowly restricted from soliciting specific AMA clients and from capitalizing on and profiting from their plainly unlawful and unethical behavior. See B.U.S.A. Corp., 2006 U.S. Dist. LEXIS 85988 at *22-23 (balance of hardships weighed in favor of plaintiff because the "injunction will prevent Defendants from misappropriating trade secrets or destroying Plaintiffs' property, which they cannot do regardless of the injunction"). Accordingly, AMA meets both tests to warrant the Court granting emergent injunctive relief.

**IV.**     <u>**AMA IS ENTITLED TO EXPEDITED DISCOVERY**</u>

AMA seeks limited discovery, on an expedited basis, that is essential for it to more fully develop the evidence and record in advance of future preliminary injunction proceedings. At this time, AMA's discovery would be limited to the depositions of Syme, Gershenson, and, if necessary, a 30(b)(6) corporate representative from G&A. In addition, AMA would seek the production of documents, on an expedited basis, limited to the following categories:

(1)     documents concerning Defendants' business relationship with Shaw, including without limitation all documents concerning any services provided by them, collectively or individually, to Shaw or any other AMA customer;

(2)     documents concerning any communications, including e-mails, by, between or among Defendants, on the one hand, and any principal, employee or representative of Shaw on the other;

(3)     documents concerning any of AMA's Confidential Information, as defined and alleged in its Verified Complaint, including without limitation all documents concerning seminars or educational materials;

(4)     copies of all materials and seminar presentations developed by, or in the process of being developed by, Defendants for Shaw or any other AMA clients;

(5)     documents, including without limitation e-mails, concerning Defendants' contractual relationships with AMA;

(6)     documents concerning Shaw's use of any of the educational materials or seminar presentations developed by, or in the process of being developed by, Defendants for Shaw, or the use of any of AMA's other Confidential Information as defined and alleged in its Verified Complaint; and

(7)     documents concerning any direct or indirect solicitation of any current or former client or customer of AMA by Defendants or any agent, employee or representative thereof.

This limited discovery is needed on an expedited basis so that the Court can set a hearing for the preliminary injunction motion at the earliest possible date. In this regard, AMA proposes that the parties complete the expedited discovery process within sixty (60) days of the date on which the Court enters an expedited discovery order.

The Federal Rules of Civil Procedure provide this Court with broad powers to permit expedited discovery and hearings when a preliminary injunction is sought. See 28 U.S.C. § 1657(a); Fed. R. Civ. P. 26(d). Many courts in this Circuit follow a flexible good cause test, in which the movant must demonstrate that the requests are reasonable under the circumstances. See OMG Fid., Inc. v. Sirius Techs., Inc., 6:06-CV-1184, 2006 U.S. Dist. LEXIS 83388, at *9-10 (N.D.N.Y. Nov. 16, 2006); Ayyash v. Bank Al-Madina, 04 Civ. 9201, 2005 U.S. Dist. LEXIS 14276, at *2-4 (S.D.N.Y. July 12, 2005). Other courts set forth a four factor test to evaluate whether expedited discovery is appropriate and require: "'(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without the expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.'" Don King Prods., Inc. v. Hopkins, 04 Civ. 9705, 2004 U.S. Dist LEXIS 25917, at *5-6 (S.D.N.Y. Dec. 23, 2004) (citations omitted). In conjunction with these factors, courts may also consider whether the request is narrowly tailored given the time constraints and whether the movant could have avoided such restraints by acting prior to the request. Id. at *6.

In this case, AMA should be granted expedited discovery because the limited discovery it intends to seek is reasonable under these emergent circumstances and it easily meets the four factor test. As discussed above, AMA will be irreparably injured if Defendants are permitted to continue soliciting and servicing its clients and using AMA's Confidential Information to do so, and it is likely to succeed on the merits. Furthermore, there is a close connection between the expedited discovery it seeks and the avoidance of injury because such discovery will permit AMA's injunction motion to be heard at an earlier date and on a fuller record. This will allow

the Court to hear directly from the most knowledgeable witnesses - Syme, Gershenson, and G&A - and allow it to fashion an effective preliminary injunction that will prevent Defendants from the unlawful solicitation of AMA's clients, thereby preventing further irreparable injury. If expedited discovery is denied, AMA will suffer greater irreparable injury because a permanent injunction motion would be delayed several months. In the interim, Defendants would certainly continue their wrongful conduct.

Accordingly, AMA respectfully requests that the Court order expedited discovery, allowing AMA to demand production of documents immediately and that documents responsive to same be served within two weeks of service thereof. In addition, AMA requests permission to take depositions within two weeks of service of appropriate notices. AMA also requests that the Court set the motion for preliminary injunction within sixty (60) days of the date of its decision on the motion for expedited discovery.

## CONCLUSION

For all of the foregoing reasons, AMA respectfully submits that this Court should grant

its Motion for a Preliminary Injunction and order expedited discovery.

Dated:  New York, New York
            August 13, 2008

Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By
Joseph A. Piesco, Jr. (jpiesco@kasowitz.com)
Daniel Turinsky (dturinsky@kasowitz.com)
Rachel F. Ehrenpreis (rehrenpreis@kasowitz.com)

1633 Broadway
New York, New York 10019
(212) 506-1700
Attorneys for Plaintiff
AMERICAN MANAGEMENT ASSOCIATION
INTERNATIONAL

23