## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of _New York_ } ss.
County of _New York_

On this the _1st_ day of _August_, _2008_, before me, _Janine Cucurullo_, the undersigned Notary Public, personally appeared _Patricia Leonard_,

☑ personally known to me – OR –

☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

_Janine Cucurullo_
Signature of Notary Public

_Janine Cucurullo_
Other Required Information (Printed Name of Notary, Residence, etc.)

JANINE CUCURULLO
Notary Public - State of New York
NO. 01CU6121254
Qualified in Kings County
Certificate filed in New York County
My Commission Expires 1-10-09

Place Notary Seal and/or Any Stamp Above

──────────── OPTIONAL ────────────

*Although the information in this section is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Affidavit_

Document Date: _8-1-2008_  Number of Pages: _11_

Signer(s) Other Than Named Above: _—_

Right Thumbprint of Signer
Top of thumb here

© 2002 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org
Item No. 5936    Reorder: Call Toll-Free 1-800 US NOTARY (1-800-876-6827)

Joseph A. Piesco, Jr. (jpiesco@kasowitz.com)
Daniel Turinsky (dturinsky@kasowitz.com)
Rachel F. Ehrenpreis (rehrenpreis@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for Plaintiff
American Management Association International

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
AMERICAN MANAGEMENT ASSOCIATION
INTERNATIONAL                                              :    Civil Action No.
                                                           :
                              Plaintiff,                   :
                                                           :
              vs.                                          :
                                                           :    **AFFIDAVIT OF**
                                                           :    **PATRICIA LEONARD**
                                                           :    **IN SUPPORT OF PLAINTIFF'S**
STUART SYME,                                               :    **APPLICATION FOR**
GERSHENSON AND ASSOCIATES, INC.,                           :    **PRELIMINARY INJUNCTION**
STEPHEN GERSHENSON, individually                           :    **AND EXPEDITED DISCOVERY**
and in his capacity as President of                        :
GERSHENSON AND ASSOCIATES, INC.                            :
                                                           :
                                                           :
                              Defendants.                  :
                                                           :
-----------------------------------------------------------x

I, **PATRICIA LEONARD**, being duly sworn, depose and say the following:

        1.       I am the Executive Vice President of U.S. Management Education for American Management Association International ("Plaintiff" or "AMA"). I have personal knowledge of the facts set forth herein, except where otherwise indicated. AMA, the Plaintiff in the above-captioned action, seeks preliminary and permanent injunctive relief against Defendants Stuart Syme ("Syme"), Stephen Gershenson ("Gershenson") and Gershenson and Associates, Inc.

("G&A") (collectively, "Defendants") prohibiting them from continuing to breach their contractual and common law obligations to AMA and, specifically, from continuing to solicit and steal away AMA's clients in violation of their contractual and common law duties, which violations have caused, and are continuing to cause, AMA to suffer irreparable harm.

## I. Introduction

2.  AMA, an 85-year old non-profit education corporation that provides management education and training products and services to the management community throughout the world, seeks to enforce its contractual and common law rights against Syme, Gershenson and G&A, former independent contractors of AMA, who secretly conspired to, and in fact did, usurp very substantial corporate opportunities properly, and legally, belonging to AMA in breach of their respective common law and contractual obligations to AMA. In their effort to do so, they have purposely and unlawfully exploited, and are continuing to unlawfully exploit, AMA's client relationships and confidential and proprietary business information (hereafter, "Confidential Information") for their own personal benefit, to the real and substantial irreparable harm of AMA.

3.  AMA, which has facilities throughout the world, maintains its corporate headquarters in New York City. AMA is an education corporation that was incorporated by the Regents of the University of the State of New York.

4.  AMA is routinely engaged to provide management education and training services to the corporate community, and, among other services, offers over 170 different seminars in a wide variety of subject areas. In order to provide its services, AMA utilizes a diverse group of independent contractors, typically referred to as "faculty," "presenters" or "speakers," who are experts in particular substantive areas, to conduct training seminars on

1

AMA's behalf. In some cases, AMA faculty also assist in the development and updating of AMA's course materials.

5. G&A is a corporation based in Florida that provides management training services, and which for several years has provided speakers for a number of AMA's most valuable clientele. Gershenson is the President of G&A and, prior to the termination of his Independent Contractor Agreement with AMA on May 23, 2008, was a presenter for AMA.

6. Prior to the termination of his Independent Contractor Agreement with AMA on May 23, 2008, Syme also was a presenter who delivered seminars and provided training to several of AMA's most valuable clients on various project management topics. Syme is affiliated with, and was paid by, G&A and Gershenson.

7. As a condition precedent to becoming a presenter for AMA, Syme and Gershenson, like all other AMA presenters, were required to execute AMA's Independent Contractor Agreement (the "Agreement"). Pursuant to the Agreement, Syme and Gershenson agreed that they would not solicit or accept engagements from any AMA clients to whom they provided, or were scheduled to provide, services on behalf of AMA during the term of their agreements, and for a period of one (1) year following the completion, or acceptance, respectively, of an engagement to such client(s). This restriction was an essential condition of their contractual relationships with AMA, and specifically was designed to prevent independent contractor speakers like Syme and Gershenson from soliciting clients to whom they were introduced by AMA and, particularly, to prohibit them from usurping AMA corporate opportunities.

8. On or about April 16, 2008, Defendants intentionally breached their contractual and common law duties to AMA by delivering a three day training seminar behind AMA's back

2

to one of AMA's largest clients, The Shaw Group, Inc. ("Shaw"), after AMA was falsely advised that this previously scheduled seminar had been "postponed," in an obvious attempt to steal this important customer relationship from AMA. Needless to say, Defendants' conduct precisely is of the type the restrictions in the Agreement prohibit.

9. AMA previously had scheduled numerous seminars for Shaw that, absent Defendants' wrongful conduct, were to take place during the months of May through July of 2008. On account of Defendants' wrongful attempts to steal Shaw from AMA, those opportunities have been cancelled. As of the date of this affidavit, Shaw has not scheduled any additional seminars with AMA. Indeed, because of Defendants' unlawful conduct, AMA's entire business relationship with Shaw is in immediate peril, and, unless Defendants are immediately enjoined from engaging in further wrongful conduct, is likely to be lost forever.

10. Defendants' unlawful conduct in soliciting and/or servicing AMA's clients is continuing, has caused, and will continue to cause, if not put to an immediate halt, irreparable damage to AMA.

11. Accordingly, AMA respectfully seeks an order from the Court, among other things: (a) directing Defendants to comply with the restrictive covenants set forth in the Agreement; (b) barring Defendants from soliciting or servicing AMA's clients to whom they provided services, or were scheduled to provide services to, on behalf of AMA for a period through and including July 25, 2009; (c) directing Defendants to return, and not to use or disclose for any purpose, AMA's Confidential Information; and (d) directing Defendants to account for, disgorge and repay to AMA any and all revenue or other monies they received as a result of their wrongful conduct.

## II.     The Non-Solicitation and Confidentiality Agreements

12.    Syme entered into the Agreement with AMA, effective April 15, 2007, which sets forth the terms pursuant to which Syme would provide services as a presenter for AMA (the "Syme Agreement"). Among other things, the Syme Agreement prohibited Syme (i) from soliciting or hiring AMA's employees, (ii) using or disclosing AMA's confidential and proprietary business information, including, but not limited to, course materials, customer lists, attendee lists, business plans and strategies, and (iii) soliciting or accepting engagement from clients that Syme provided services to, or was scheduled to provide services to, on behalf of AMA, for a one (1) year period following the completion of an engagement for AMA. A true and correct copy of the Syme Agreement is attached to the Complaint as Exhibit A.

13.    Specifically, Paragraph 4 of Exhibit A of the Syme Agreement states, in pertinent part, as follows:

> **Other Clients.** Except as expressly provided herein, nothing in this Agreement shall restrict you from offering speaking, teaching, consulting or other Services to any other organization, corporation, institution or person. <u>Your acceptance of an engagement from AMA, however, indicates your understanding and agreement not to solicit or accept engagements from AMA's clients or attendees to whom you have provided or will provide Services on behalf of AMA for the period during the term of this Agreement and for one (1) year following the completion of an engagement to such client(s) or attendees.</u> The foregoing restrictions include, but are not limited to, soliciting attendees for, or accepting from such attendees, assignments for on-site engagements, distribution of non-AMA course materials and/or the presentation of logos, copyrights and trademarks other than those of AMA and related affiliates.

(Emphasis added).

14.    In addition, the Syme Agreement required Syme to refer to AMA "[a]ny inquiries . . . relating to such Services from or on behalf of AMA clients and/or attendees during the

4

applicable time period set out herein."

15. Gershenson executed the Agreement, effective July 1, 2006 (the "Gershenson Agreement"). A true and correct copy of the Gershenson Agreement is attached to the Complaint as Exhibit B. As with Syme, the Gershenson Agreement contains a restriction prohibiting Gershenson from soliciting, providing services to or accepting engagements from any AMA clients to whom he provided, or was scheduled to provide, services during the term of his Agreement and for a one (1) year period following the acceptance of an engagement for AMA.

16. In addition, pursuant to the Agreement, Gershenson, like Syme, was required to refer to AMA "[a]ny inquiries . . . relating to such Services from or on behalf of AMA clients and/or attendees during the applicable time period set out herein."

17. In addition, pursuant to their respective Agreements, both Syme and Gershenson were required to refrain from using or disclosing any of AMA's Confidential Information or property. Specifically, Paragraph 5 of the Gershenson Agreement states as follows:

> <u>Confidentiality</u>. In consideration of the granting by AMA of access (if any) to Contractor to AMA Proprietary Information, as hereinafter defined, in connection with the performance of this Agreement, whether acquired directly from AMA or its employees, or by visiting AMA's offices or facilities, Contractor hereby agrees to treat such Proprietary Information in confidence, as follows:
>
> (a) Contractor agrees not to disclose Proprietary Information to any person, directly or indirectly, without the written consent of AMA, except to officers, employees, directors of Contractor or persons retained by Contractor for purposes of this Agreement on a need-to-know basis and only after informing such persons of the confidential nature of the information and directing such persons to treat such information confidentially.
> (b) Contractor agrees not to use or exploit the Proprietary Information for any purposes whatsoever without the written consent of AMA.
> (c) Upon AMA's request, Contractor shall promptly return to AMA all materials and items furnished to Contractor by AMA and any copies thereof, and to purge any and all documentary, photographic, computerized or other information relating to the Proprietary

5

Information from the records of Contractor.

Proprietary Information means information and data of and/or related to AMA gathered or made available during the course of this Agreement including, but not limited to, know-how, methods and processes, customer and membership lists, attendee lists, business plans and strategies and the like. Proprietary Information does not include information that either was in the public domain at the time AMA revealed it to Contractor or came into the public domain any time thereafter through no fault or action on the part of Contractor, or has come into Contractor's possession independently (not from a third party source that obtained the Proprietary Information, directly or indirectly, from AMA).

18.  Paragraph 5 of the Syme Agreement states as follows:

<u>Confidentiality</u>. In consideration of the granting by AMA of access (if any) to Contractor to AMA Proprietary Information, as hereinafter defined, in connection with the performance of this Agreement, whether acquired directly from AMA or its employees, or by visiting AMA's offices or facilities, Contractor hereby agrees to treat such Proprietary Information in confidence, as follows:

(a) Contractor agrees not to disclose Proprietary Information to any person, directly or indirectly, without the written consent of AMA, except to officers, employees, directors of Contractor or persons retained by Contractor for purposes of this Agreement on a need-to-know basis and only after informing such persons of the confidential nature of the information and directing such persons to treat such information confidentially.

(b) Contractor agrees not to use or exploit the Proprietary Information for any purposes whatsoever without the written consent of AMA.

(c) Upon the earlier of the termination of this Agreement or the Services, or upon AMA's request, Contractor shall promptly return to AMA all intellectual property, materials and items furnished to Contractor by AMA and any copies thereof, and to purge any and all documentary, photographic, computerized or other information relating to the Proprietary Information from the records of Contractor.

Proprietary Information means information and data of and/or related to AMA gathered or made available during the course of this Agreement including, but not limited to, know-how, concepts, techniques, trade practices, methods and processes, customer and membership lists, attendee lists, business plans and strategies and the like. Proprietary Information does not include information that either was in the public domain at the time AMA revealed it to Contractor or came into the public domain any time thereafter through no fault or action on the part of Contractor, or has

come into Contractor's possession independently (not from a third party source that obtained the Proprietary Information, directly or indirectly, from AMA).

19. AMA takes reasonable steps to protect its Confidential Information, including, but not limited to, requiring its independent contractors to sign the Agreements which contain the aforementioned confidentiality provisions.

### III. Defendants Conspire to Steal One of AMA's Largest Customers

20. One of AMA's largest customers is The Shaw Group, Inc. ("Shaw"), a corporate conglomerate that provides engineering, design, construction, and maintenance services to government and private-sector clients in a wide array of industries, including the energy, environmental, infrastructure, and emergency response markets. AMA has been providing management educational services to Shaw since February 2006. During this time, AMA and Shaw have enjoyed a healthy business relationship, whereby AMA provides an array of training services and related seminar materials to Shaw.

21. Since the inception of AMA's relationship with Shaw, Gershenson and Syme have acted as presenters for AMA (with AMA paying G&A directly for their services) and, up until the termination of their Agreements, have conducted training seminars and provided services to Shaw on AMA's behalf on numerous occasions.

22. It is my understanding that neither Syme nor Gershenson (nor G&A) had any prior business relations with Shaw (or any of the other clients to whom they have presented on behalf of AMA) prior to presenting seminars at AMA's direction.

23. On or about October 15, 2007, Shaw entered into a Training Agreement with AMA (the "Training Agreement"), pursuant to which AMA agreed to provide training to all of Shaw's business units.

7

24. Paragraph 12 of the Training Agreement states as follows:

> <u>Hiring or Retention of Personnel</u>. During the term of this Agreement and for one year following the termination hereof, neither party shall recruit either as an employee or on an independent contractual basis any person who is an employee of the other party or retained on an independent contractual basis by that party for purposes of this Agreement, without the prior written consent of that party.

25. One of Shaw's business units is Shaw Environmental & Infrastructure ("Shaw E&I"). AMA has conducted management training on numerous occasions for Shaw E&I during the course of its relationship with Shaw, and had scheduled a management training seminar with AMA for April 16-18, 2008 (the "April 16th Training Seminar"). Additional seminars were scheduled to be conducted for other Shaw business units in May through July 2008 as well. All of these seminars were scheduled in accordance with, and pursuant to, the Training Agreement, and were to be delivered by Syme.

26. On or about April 9, 2008, Shaw E&I informed AMA that it was "postponing" the April 16th Training Seminar until June.

27. On or about April 16, 2008, an AMA representative visited the site where the training for Shaw E&I was to have occurred and discovered that the April 16th Training Seminar was proceeding as originally scheduled, with Syme as the presenter, but without AMA's knowledge and participation. Neither Syme nor Gershenson informed AMA that the April 16th Training Seminar was proceeding as scheduled.

28. On or about April 18, 2008, the AMA representative confronted Syme, who confirmed he was conducting the Shaw E&I training program independent of AMA. It is my understanding that Shaw paid G&A directly (and hence Gershenson) for the training services, who in turn paid Syme.

29. Based on AMA's investigation, it is clear that Syme, Gershenson and G&A

8

intentionally colluded to interfere with AMA's client relationship with Shaw and to unfairly usurp this and all future corporate opportunities that, but for their wrongful conduct, would have been AMA's. Defendants' conduct in presenting the April 16th Training Seminar to Shaw E&I was in direct violation of the restrictive covenant provisions contained in both the Syme and Gershenson Agreements.

30. By letter dated May 23, 2008, AMA terminated the Agreement between AMA and Syme on account of Syme's flagrant breach of the contractual restrictions contained therein, including without limitation his agreement not to solicit or service AMA's clients, as well as his express obligation to bring all opportunities to present to AMA clients to the attention of AMA.

31. By letter dated May 23, 2008, AMA terminated the Agreement between AMA and Gershenson on account of Gershenson's flagrant breach of the contractual restrictions contained therein, including without limitation his agreement not to solicit or service AMA's clients, as well as his express obligation to bring all opportunities to present to AMA clients to the attention of AMA.

32. Based on AMA's investigation thus far, it is clear that Syme and Gershenson, with the direct aid of G&A, are seeking and intend to continue to provide management training to Shaw, in breach of Syme and Gershenson's express contractual agreements with AMA.

33. It is my further understanding that Defendants have attempted, and, upon information and belief, are continuing to attempt to, solicit and provide management training to other AMA clients in breach of their express contractual agreements with AMA.

34. On May 23, 2008, AMA sent letters to both Syme and Gershenson demanding, among other things, that they immediately terminate their unlawful solicitation and servicing of Shaw. Both of them refused to provide any assurances to AMA or agree to refrain from

providing services to Shaw. Quite the contrary, Syme and Gershenson took the untenable position that "Shaw E&I" was not a "client" of AMA – despite both having presented to Shaw for years on AMA's behalf and despite the fact that Syme was actually scheduled to present a seminar to Shaw E&I on April 16, 2008 for AMA – and that they were free to take the business from AMA.

35. I respectfully submit to this Court that, absent an injunction, Defendants will continue to conspire together in an effort to misappropriate for themselves AMA's valuable client relationships.

36. Since April, on account of Defendants' wrongful conduct and interference with AMA's relationship with Shaw, Shaw has cancelled numerous previously scheduled seminars with AMA. Further, Shaw has not scheduled any additional seminars with AMA, and has indicated that it may substantially reduce or no longer utilize AMA's services in the future.

37. Defendants' unlawful conduct and material breaches of their contractual obligations has caused, and is continuing to cause, AMA to suffer substantial irreparable harm, including, without limitation, the loss of goodwill and its valuable and irreplaceable client relationships.

38. It is my understanding that Defendants' wrongful and malicious conduct was (and is) deliberate, calculated and purposeful, and that their conspiracy was intentionally designed to sabotage AMA's relationship with Shaw and to destroy the good will AMA had worked tirelessly to establish with Shaw over the years, with the ultimate goal of stealing Shaw's business for themselves -- ***business that would have generated millions of dollars in revenue for AMA in the future.***

39. By breaching their contractual obligations to AMA as described above, Defendants have irreparably harmed, and continue to irreparably harm, AMA. Accordingly, I respectfully request that the Court issue an injunction and provide to AMA such other relief as necessary to stop Defendants from engaging in their unlawful and wrongful conduct.

I HEREBY CERTIFY AND ATTEST that the foregoing statements are true and based on my personal knowledge except where otherwise indicated. I am aware that if any of these statements are willfully false, I am subject to punishment.

_____
Patricia Leonard

Sworn to before me this
1st day of August, 2008

11